May it please the Court, Your Honors, my name is Carrie Hoffman. I'm here representing Appellant Denton County Electric Cooperative doing business as co-serve. I'll refer to Appellant as co-serve throughout my argument. We're here today on co-serve's appeal under Sections 8A1 and 8A5 that the board found, the National Labor Relations Board found, that co-serve improperly withdrew recognition from an incumbent union and then improperly issued a bargaining order based on that decision. Those are the two primary issues I'll be arguing. With respect, yes? You concede the wage freeze issue because you didn't brief it? Yes, Your Honor. Thank you. I appreciate your candor. With respect to the withdrawal of recognition, I would or the National Labor Relations Board looked at the evidence in front of it and determined that because wages were impacted, meaning wages were involved, that there had to be an improper withdrawal of recognition. But when the court reviews the evidence as a whole, and that is the court's obligation to review the evidence as a whole, it is not a mere rubber stamp of the National Labor Relations Board decision, that evidence is undermined or undermines that decision. There were only... Yes, Your Honor? Is the board's order stayed while the appeal is pending? Yes, Your Honor. Okay. So the status quo, the unit employees to the extent they are the same employees that were impacted in 2014 are acting as if there is no union involved today. The evidence undermines the board's decision. There were only three employees who testified of the unit employees who were permitted to testify before the board that they were aware of Kevin Vincent, the supervisor's, alleged comments that the union was responsible for them not receiving their raises. All of those employees testified they did not sign the petition for decertification. One of them said, in fact, that the fact that his supervisor told him that pushed him more toward the union, which is, again, the opposite of what the board found. The board found that because wages were involved, it must have pushed the employees toward the union. That's not what the evidence was in front of the ALJ or the board. Counsel, it seems that your strongest argument is that the employees testified that the unfair practices had nothing to do with their decision to oust the union. But under master slack, do we care about the actual reason that the employees gave, or do we look at what could have tended to influence, rather than what the... I understand. And under master slack, we have to look at what the actual evidence was and whether it tended to cause disaffection. So you're correct in that standard. But the actual evidence was that the majority of the unit had no knowledge of Kevin Vincent's alleged comments. The individuals who worked for Kevin Vincent were in an isolated group and the report from ALJ at the time was that those five employees worked in isolation from the rest of the unit. They all testified that the only people they spoke to were the other people within their five employee part of that unit. And there was simply no evidence that any employee heard or was aware of that. Additionally, your honor, the employees as part of that analysis, the employees that we are talking about that didn't hear Kevin Vincent's comments are also the same employees who were receiving wage increases during that time frame. So these employees were in an employee development program and as they met the next step in that level, they received a pay increase. So they weren't aware of this wage range concept that may have increased the floor or the ceiling in the wage range they were eligible for. They knew that on fill in the blank date, they met the criteria to move to the next level and they received a pay increase as they had been receiving pay increases all along, both before and after the union came in. Let me ask you this. Was it appropriate for the board to consider violations that had been settled in determining that those settled incidents tainted the recertification? Yes, your honor. The board decided that factor, but the board is also the one who drug its feet in resolving the settlement. In other words, the company and the union and the board had decided to resolve those matters and issuing the final settlement took the board months inexplicably because the parties had reached an agreement. They were entitled to look at the totality of the circumstances as they did, but again, they didn't look at the actual evidence and the details in this matter matter. It's important to note that at the time that the board looked at this evidence, Kevin Vincent was no longer a supervisor over any employees in the unit. So again, they determined that wages were a bread and butter issue in front of them and therefore there must have been taint and didn't really delve into the details and the details are important. Again, these are about pay range increases as opposed to an individual's pay that's being affected day to day. One of the things that the board and the ALJ talked about was the timing, but the last time Kevin Vincent was alleged to have made these comments was in April of 2014 and COSERF withdrew recognition seven months later in November of 2014. Again, the employees who signed that petition were unaware of those comments and had been part of a program where they were regularly receiving raises. Another important fact is that wages weren't really a big issue between the company and the union, so much so that the union's lead negotiator testified during the trial that he would have accepted any wages COSERF offered. Now, the ALJ discredited that testimony as something he didn't believe, but that was the lead negotiator's big deal in the context of this union and this negotiating session. It was a big deal to the employees, though, isn't it? I never worked anywhere that wages wasn't a big deal. I'm not arguing with that, Judge Davis. I'm just simply saying the context in which these employees brought the union in, the undisputed testimony, was that it was not about money. Obviously, everyone wants to make more money. I'm not going to dispute that fact, but big picture, these employees... That's a water fountain discussion all the time. Again, Your Honor, I understand employees are talking about wages. These employees, again, for the most part within this unit, were regularly receiving wage increases as they moved through the employee development program, and they didn't hear that issue. Again, this is a negotiator who testified under oath that he would have taken any wages COSERF offered, regardless if they were lower. I understand. I can roll my eyes at it, too, but that is what he testified to. So, your position is that the substantial evidence does not support that because the only evidence really is on your side? Correct. I don't believe there's any evidence on the union side in this equation, and therefore, I think that COSERF was entitled to withdraw recognition. Your other argument about the bargaining order, that's separate. You mean even if you were to lose on this argument, you still believe the bargaining order is improper? Is that right? That is correct, Judge Elrod. Turning to that issue, our argument is that the board's argument in their supplemental briefing last week was that if there's a wrongful withdrawal of recognition, assuming for the sake of argument that you all determined that we did not meet our standard and we wrongfully withdrew recognition, that a bargaining order is appropriate in that GISSL doesn't apply to this court. I would argue and submit that this court's decision in Daisy's Originals Inc. of Miami v. NLRB 468 Fed 2nd 493 is a wrongful withdrawal of recognition case. It determines that the bargaining order under those facts and circumstances was not warranted. This is a GISSL, too, not a non-GISSL, isn't it? Yes, Your Honor. My point is that this court has recognized that this is the same policy, the same policy decisions in wrongful recognition cases apply in GISSL. This court's made that decision in NLRB v. Anvil Products, and that what this court has to do is determine what the employee's Section 7 rights were and whether the nature of the ULPs and the employer's role in the decertification petition had an impact. And again, as I've been arguing to this court, this is not that situation. When you look at the D.C. Circuit's decision in People's Gas v. NLRB, which this court adopted in Texas Petrochemicals, the goal is to determine whether the order is not a punishment but remedial in nature, and that what we need to determine is whether the unlawful refusal to bargain is whether it's going to have an impact on the fair election process at the time the board makes its decision. A lot of factors should go into that. It's been four years since COSERV withdrew recognition, almost five, and the employee turnover rate, that's something courts are allowed to consider in making this decision. This is an extraordinary remedy, and there's been no showing, again, by a group of individuals who testified regularly that whatever wage conduct existed had no impact on their decision to vote in or vote out a union. Now, the employees held two decertification votes. Isn't that right? Well, one, Your Honor. They voted the union in in 2012. There was a decertification petition in 2013. An election was held, and the union prevailed by one vote. So one of the things the board talks about is this dramatic swing of support between 2013 and 2014, and the reality was it was pretty close in 2013, and having another five or six swing to the company side and sign a decertification petition isn't dramatic. It was a very close election in 2013. It's part of the argument of these employees were completely aware of what their rights were. They knew which individual they wanted to put their trust in. What they testified to at trial was that they no longer trusted the union. The union had done a poor job of communicating with them about any issues, status of bargaining, et cetera. Counsel, I'm going to ask opposing counsel this question, too, but why weren't any of our cases cited to us in the briefing that we had to ask for supplemental briefing for our cases? We agree that it's not D.C. Circuit law. It's the Supreme Court and us, right? Yes, Your Honor. I do believe this court has adopted the D.C. Circuit's rationale and people's demands. And you mentioned that. But you are correct, Your Honor. I think that is because the ALJ and the board cited so we got caught up in that analysis. And for that, all I can do is tell you we understand you all wanted Fifth Circuit precedent. We've done our best to provide it to you in our supplemental briefing. So this is a union that had been in place for two years. It didn't win the hearts and minds of its constituents. Again, it had barely survived decertification. And remember, this is a lead negotiator who testified at trial he would take any wages that were being offered to him. These employees were entitled to think he's not doing that good of a job. There's been no evidence of taint in front of this court. There's no reason to believe that, again, given the passage of time, which is a factor this court can consider, that there is no reason, that there isn't a reason a fair election could not be held today. Again, there was no evidence that these employees understood what kind of conduct was going on. And for those reasons, I would submit that a bargaining order is not the appropriate remedy. This court could order an election. This court could order remand. But a bargaining order itself is too severe. It doesn't effectuate the policies of the National Labor Relations Act, and it doesn't give any impact to the employees' Section 7 rights. And do you separately protest the public notice reading order? Yes, Your Honor. The public notice reading order seems, again, given to a group of employees, many of whom aren't even aware of the union, will have no impact on them. It doesn't seem to be supported by the facts. It seems, again, more punitive than remedial in nature. Thank you. All right. I'll see you back on the bone. Mr. Casserly? Good morning, and may it please the Court. My name is Dave Casserly. I'm representing the National Labor Relations Board. I'll start off by mentioning that, in general, under the National Labor Relations Act, an employer may not withdraw recognition from a certified union. It is a narrow exception that an employer may do so in narrow circumstances when there has been objective evidence presented to it that is untainted by unfair labor practices. Now, the Board has never found, to my knowledge, that a change to employee wages that affects the entire bargaining unit is minor enough of an unfair labor practice under Master Slack that it does not affect employee, does not taint a decertification petition. Opposing counsel argues that this should be the first case in which the Board has ever found that, but the circumstances of this case do not show that that's true. The wage increase at 2.3%, and all employees would have been paid 2.3% more had this unilateral change not happened. It's true that it wouldn't have been directly immediate in early January. These were phased in throughout after employee evaluations. Some may have had merit increases above or below 2.3% more if this unfair labor practice had not occurred. Now, as to the issue that wages were not a big deal in this particular unit, there's actually not that much evidence saying that. The Board is entitled to rely on its precedent finding that wages are one of the, and court precedent, finding that wages are one of the primary motivators in collective bargaining. Well, but if the evidence in the testimony in this case is to the contrary, isn't that a problem? Well, Your Honor, so first of all, the union negotiator's testimony that he would have agreed to any wages at that point was discredited. He said that because he wanted the Board to find that they had already reached a contract and they just had to reduce it to writing, and that was something that the ALJ discredited, and it wasn't true. And in fact, the bargaining sessions before that had several discussions of wages, which is why it had been drawn out to late November in the first place. Was the testimony that the processes had, that it was because of the money to the political parties and that this is what was upsetting them, was that also discredited? Your Honor, the Board didn't rely on that. It wasn't specifically discredited. The difference there is that was testimony by unions as to their individual reasons for their disaffection, and the Board precedent is clear that that's not a reliable indicator that the Board looks at. So whether you want to consider it— What are the facts in the record that we can look at? I understand you say, well, in general, we live in this world, so you can say any time it's wages and it results in this change, then this is the result. It's kind of like a Ray's IPSA thing, basically, in this area. What are the actual facts in this record, though, that's the substantial evidence that supports it in this case? Yes, Your Honor. So first of all, the Board looks at the nature of the unfair labor practice, which is a factual matter as to what that unfair labor practice was. So in this case, this was a cut to wages or an unlawful refusal to increase wages of employees. The Board also looks to timing. Now, employees had their anniversary dates throughout the year, and these wage increases would have been implemented on or immediately after their anniversary dates when they get evaluated. So that's when the employees would individually find out about it. The other fact the Board relied on here is it relied on Vincent's statements explicitly blaming the union for the lack of these rates. What about the fact that people didn't have access to those statements and didn't know of those statements? Your Honor, the record is far less clear on that than imposing counsel said. First of all, all the testimony is that the operators did know the other employees in the unit, even though they weren't working in the same office. These operators are the dispatchers as opposed to the linemen, which are the majority of the rest of the unit. So those, the operators, the evidence is that they talked amongst themselves about them. There's no evidence that they didn't say, tell any other employees. There's no, there's evidence. Is there evidence that they knew of Kevin Vincent's remarks and talked about it and that this was a motivating factor? Is that, any of those questions in the record? There's evidence that four or five of the system operators knew of Vincent's comments. There's not explicit evidence that any of the other employees knew of them, Your Honor. In fact, it's to the contrary on the others. There's what? There's evidence that if it was believed, it's to the contrary. No, Your Honor. There's no evidence that the other, any other employees didn't know of the comments, of Vincent's comments. There's no real evidence either way on that issue. Do you have evidence that supports the substantial, any other substantial evidence that you want to cite? Sure, Your Honor. So another factor here are the journeymen who are at the top of the EDP wage scale. This is the only raise they receive per year. They're topped out under the step raises system. So they're, these are people who work directly with the linemen and are linemen and obviously they're going to notice that they're not receiving a raise once a year. So the board reasonably inferred based on those two pieces of information on Vincent's comments and on the fact that some linemen, well, all of the linemen didn't receive what they were entitled to. So comments and didn't get the raise. Yes, Your Honor. That's it. That's your substantial evidence. Yes, Your Honor. Okay. And it's a pretty, you know, it's a substantial raise. And again, it's a heavy burden to show that petitions are untainted by unfair labor practices. Keep in mind the other... Is that really the standard? The standard is massive size, Your Honor. Do they have to show that it's untainted by the labor rather than you have to show that it was tainted originally? Your Honor, this court's language in discussing withdrawal of recognition cases has been, I believe the language is, withdrawal is only lawful if objective evidence untainted by unfair labor practices has been presented. There's no language there about the burden either way, but it's a, you know, it's a legal conclusion on the board's part under master slack the test. It's certainly the general counsel's burden to prove that the unfair labor practices happened, but the general counsel did so in this case. Yeah, the general counsel bears the burden. They don't have to prove that it didn't happen. You have to prove that it did. Yes, Your Honor. But again, that's not where the unfair labor practice happened here, and there's plenty of evidence of that. I took your question as asking for evidence of taint beyond the fact of the unfair labor practices themselves. Okay. If the court has no further questions on the taint issue, I'll move on to the bargaining order. Now, in the briefing in this case, in the first round, in our responding brief, we cited Airborne Express, this court's opinion, for the proposition that this court distinguishes between withdrawal of recognition cases and refusal to recognize cases. It calls the first circumstance, withdrawal of recognition, a non-GISL bargaining order, and it calls the second a GISL bargaining order. Our vast majority of cases call it a GISL 2, just like the Supreme Court. Your Honor, the Supreme Court in GISL 2 was referring to a different type of situation where the board has shown an informal, sorry, where the union has shown an informal indication that it has majority status. So that's when, say, the union has never won an election, okay? The union has not won an election, but it has a card majority. Employees have signed a petition or signed authorization cards showing that they select the union. Then unfair labor practices happen that the board finds to erode the union's position. In that case, the board, it's a GISL 2 bargaining order because the union has never represented those employees. The issue is whether, the board then looks at whether the unfair labor practices were severe enough to warrant the extraordinary remedy of a bargaining order which bypasses an election. As an arguendo, that we disagree with you, assuming arguendo, and we believe it is a GISL 2 case, does that require remand in this case? No, Your Honor. The second issue here is that the board actually followed Vincent Industrial Plastics. So the judge, the administrative law judge, did not, and COSER have raised to the board saying, in its exceptions, that the board has not specifically justified the bargaining order here as required by the D.C. Circuit precedent. The board acknowledged that precedent, cited Vincent, and said, we disagree with that precedent, but here are all the reasons that we're going to enforce the bargaining order, and that's at, or we are going to order the bargaining order anyway. That's at pages 1798 to 99 of the record. We believe that any challenge to that finding has been waived here. None of the board's findings there were cited in the opening brief. None of it was challenged. It was, they simply said, well, Vincent says you must individually justify a bargaining order, and that was not done here, but they didn't do anything to challenge any of the specific reasons the board gave in those two pages. They just said one sentence saying the board didn't do it, which would have been true if the board had simply adopted the ALJ without any further comment, but that didn't happen here. The board provided further comment, and it explained its reasons underlying the bargaining order. So either way, you think that you can prevail? Yes, Your Honor. We believe we But you didn't really engage at all with American Cable. Yes, Your Honor. Would you please address American Cable now? Yes, Your Honor. We believe American Cable is a Gissel case. It's a Gissel 2 case. Assuming this is a Gissel 2 case, just like American Cable, why shouldn't it be treated the same? Well, one difference here is that, again, this is an incumbent union, so this has previously represented the employees. So the board doesn't have to overcome a sort of hurdle, as it did in American Cable, of demonstrating that an election should never happen. An election has already happened here. Do you believe that there's tension between American Cable and Air Express? I don't think so, Your Honor, because I do think, again, we think that this court's law is clear in distinguishing between Gissel and non-Gissel. Right, but there's a big argument that it is a Gissel case. It's a Gissel 2, and it's not non-Gissel. If this court disagrees and thinks that Airborne Express doesn't stand for the proposition that, thinks that that is not a way to distinguish between Airborne Express and future cases, then yes, there's a lot of tension in this case. But then we would have to follow American Cable rather than Airborne Express because of our rule of orderliness, wouldn't we? Well, Your Honor, again, the distinction that we have supplied is a valid distinction between the two and gives grounds for following Airborne Express. The distinction we've provided makes sense as a way to distinguish between the two, which is that one involves a case where the union has never been certified as the collective bargaining representative, and the other does. If the court doesn't think that distinction is important, then yes, this is a situation where Airborne Express would have been a deviation. But again, we think that that distinction is important, and that's why there's a difference between those two cases and between other Gissel 2 cases in this court and Airborne Express, among the others cited in our supplemental briefing discussing withdrawals of recognition from an incumbent union. If there are no more questions on the bargaining order, I request that this court enforce the board's order in full. You're not quitting, are you? No. Because we haven't talked about the public notice reading order. Oh, no. Please, Your Honor. And I think the Chief may have questions. No, I was just about to ask what you did. He was leaving totally. Yes, sorry. Was that about the notice reading, Your Honor? No, no. My question was going to be about the reading of the order and so forth that you had not addressed. Yes, Your Honor. So the notice reading, the board applies a notice reading when there have been severe unfair labor practices that affect the entire bargaining unit. And here, it found that the withdrawal of recognition was such kind of unfair labor practice. This is a ULP that affects the entire unit. It deprives them of their representative. It deprives them of any opportunity to negotiate their terms and conditions of employment. And it has a very longstanding effect. It takes a long time to go through board processes and get them, the representative, back at that point during which they've been deprived the opportunity of being represented by a union. Is it the bargaining orders tend to be in . . . Well, I guess it's debatable how severe the taint is, as you argued, but is it the case that the bargaining orders tend to issue where there are repeat violators or more flagrant than in a case like this where at least there's the employee's testimony about their disagreement with the union and so on and so forth? Your Honor, bargaining orders, no. They don't usually issue . . . they don't have anything to do with repeat or flagrant violations. But if you're referring to the notice reading, it is true that in most of the board's cases, they issue with repeat or flagrant violators. In this case, the board found that this was a flagrant violation with the withdrawal of recognition and particularly the blaming of it on the union. Do you concede, though, that this is not a repeat violator? Yes, Your Honor. The board did not consider the settled conduct in supporting that. Do we have any authority that says when it's not a repeat violator that we should still do this? I think there's been one case in this circuit where a first-time violator has been issued a notice reading. There's no . . . there are not many notice reading cases in this circuit. There's like four or five of them. So there's nothing that's close to on point. Why isn't Judge Henderson's concurrence in HTH Corp. in the D.C. Circuit illustrative and helpful to us in this situation? So Judge Henderson's concurrence in HTH, if I recall correctly, made two points. One was about the board's authority under 10C and that the board has no other remedial authority other than under 10C, which I don't think is relevant here. And the other was to say that, I mean, I believe that case is pretty easily distinguishable in that that was a severe violator and that was a repeated violator. Right. This is not at all. And so why should a public reading be appropriate there? Well, Your Honor, I don't . . . They're not really as severe compared to that. Well, as the board found, it's a widespread violation that affects the entire union. It's true. This is definitely not as severe as HTH. Very, very few cases are. Have you seen . . . I mean, any case with this less severe of facts that would justify a public order? Well, Your Honor, the board found in a very similar situation in a case called Bazzuto's, which was cited in our brief that a notice reading was appropriate. Not the board. Yeah. I'm asking if the circuit has ever found that. I don't believe it's ever been challenged in a case that involves strictly just a withdrawal of recognition. Is there a chill atmosphere of fear here that you've documented in this record? Your Honor, there's . . . Which is normally present before that's ever argued? Well, Your Honor . . . A chill atmosphere of fear. A chill atmosphere of fear. There's certainly an atmosphere that workers' unionization rights will not be respected. Fear, I don't know . . . That's in the record? Yeah. I don't know that I would go as strong as fear, Your Honor, but, yeah. Okay. The board agent option. Yes, Your Honor. Why isn't that an improper imprimatur of the board on the union activities? Well, this is the board's order, Your Honor. It's not anything . . . It's not the union's. It doesn't cite . . . It's not the union's language. It is the board government official's order. That's why the board doesn't have unions read the notice, because that would be improperly . . . How much of a conflict with the neutrality, though? It's perfectly neutral for the board to summarize its findings and state them before the employer's employees, Your Honor. And the reason the board agent's option there is to give the employer a choice to respect their speech rights if the employer thinks that publicly reading the notice is somehow saying that they agree with it in some way, they can say, We don't want to do this. We can have the board agent do so instead. The board gives the employer the option to do that, to decide which of those it would find less diminishing, I suppose, in this circumstance. Can the board . . . I mean, can the employer read it, but say, This is a stupid thing that we have to read? No, Your Honor. They have to do so in the presence of the board agent. Well, they can still say it in the presence of the board agent. Yeah. I mean, do they have to be . . . I'm not specific . . . . . . respectful about it? I'm not specifically aware of the notice reading situation of those cases, but the board has a doctrine for posting of notices that if the employer posts a side notice saying, Ignore this notice. What this notice says is wrong, that side notices are prohibited. So I think if the employer said something regarding the notice, like said, We don't think this is proper or something like that, I think that would be an analog as a side notice, Your Honor. So I think that would probably be prohibited. But the board . . . I totally disagree with this and think we were railroaded, but the government is really strict on these things, so here it is. Yeah, I think that would probably qualify as a side notice, Your Honor. But again, I'm not really aware of that being an issue in the notice reading context, only in the notice posting. And I'm certainly not aware of any cases where the board has policed how it's like that in a notice reading situation. So that would be a matter for compliance proceedings, I think, if the board believes the notice has not been sufficiently read. All right. Thank you, Mr. Kessler. Thank you, Your Honor. Back to you, Mr. Kessler. I'm so sorry. Is the board still non-acquiescent across the board? What do you mean? In what case, Your Honor? All cases that you don't have to follow any circuit's precedent. Well, the board's doctrine is that it follows circuit's precedents for that case itself. Well, no, but it does its own thing, which is like in our arbitration context. Yes, Your Honor. Where you're non-acquiescent for a long period of time. Are you non-acquiescent in this area, too, so that you would find, according to your own policies and rules as a poet, because our circuit's case law wasn't looked at until much later? So you mean only in the bargaining order situation, not in the rest? Because in the merits of this case, as opposed to the remedy, we think that this circuit's case law is on all fours of the boards. Right. I'm saying in the bargaining order. In terms of the bargaining order, the board is explicitly non-acquiescent with the D.C. Circuit. It says, we disagree with this, but this is a special circumstance. Are you non-acquiescent with the Fifth Circuit? No, Your Honor. The board does not think that the Fifth Circuit's precedent in this area is contrary to its own. And I will add that this is a different non-acquiescent situation, sort of, by the board than others, in that the board, in this type of case, if the bargaining order issue is raised to the board, the board always evaluates it under the D.C. Circuit standard. It says, we don't agree with the D.C. Circuit standard, and it cites for that position. And then it does, as it does in this case, it says, we acknowledge that the D.C. Circuit disagrees with us and that everything can be appealed to them. So here is why it's, this is still valid under the D.C. Circuit's precedent. So that's what the board does here. I mean, I guess it's a little different than a non-acquiescence where they don't say anything. Thank you. Thank you, Your Honor. All right. Any further rebuttal? Ms. Thompson? Your Honor, I just want to address a few points that my opposing counsel brought up. One was this issue of the taint and it being widespread. Again, the record is very clear that the employees who testified testified, A, that wages were not the issue, and B, that they were not aware of the fact that they either didn't receive a raise or that the supervisor had made those comments, likely because, again, the majority of them had received raises because of the way that the employee development program worked. This issue was just not widespread within the unit. The wages didn't taint the employees under Master Slack. On the anniversary date, they weren't all keenly aware of this problem? Your Honor, that was their testimony. It's undisputed in the record. The board cross-examined them to its intent, to its best degree. These employees were not aware. Again, the majority of them had received raises anyway. So they were not aware, necessarily, of some increase on an anniversary date. There's additionally no evidence in the record as to when each of these employees' anniversary dates would have occurred, so there's no ability to look at the timing. But the timing that we have in the record is seven months, and this court has said days or weeks is more appropriate when you're talking about taint. On the issue of the way the board issued its remedy in this case and said that it went through the Vincent Plastics or analysis, all it did was quote Vincent Plastics. It didn't compare the standard to the facts in this case. It just gave me four paragraphs quoting Vincent Plastics. Therefore, I still don't think the board justified the extreme remedy of a bargaining order. We sit here today, four years later, these employees, many of them are unaware. That is a factor this court has permitted to evaluate in this process. And I don't believe that Air Express really applies in this situation. While this court did look at the wrongful, alleged wrongful withdrawal of recognition in Air Express, the order in that case came down not because a bargaining order was appropriate, but because that union, excuse me, that company withdrew recognition from that union within the one-year certification time period. And this court's order in Air Express limited itself to those who withdraw recognition before the one-year bar were going to hold you to the one-year bar. And that is the holding of Air Express. It goes through the analysis of the facts as this court has done in the cases that have been before it, but its holding is limited to that one-year bar. And then finally, with respect to the reading issue, big picture, this court has required it to be a flagrant violation. And there's just no evidence in this record. Again, as I keep coming back to, the details matter. There's no finding that anyone at the company, with the exception of Kevin Vincent, was in any way involved in discrediting the union and that Kevin Vincent's comments were limited to those five individual employees within that unit. That was their testimony. The only people I talked to about it were the people who were other system operators. And those employees testified they worked in an isolated room separate and apart from the rest of the unit. There's no evidence that anyone at the company was involved in that. In fact, the record, the ALJ found that the company and the union had been negotiating very diligently and peacefully for over two years prior to the time that the company withdrew recognition based on the petition that came to its attention. So these are not severe facts and not something, there's no evidence that this company, if ordered to go back, would not follow the rules of the law. Thank you, Your Honors. All right. Thank you. All right. Thank you, Kim. Both sides, before we